UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

BLACKMOSS INVESTMENTS INC.,
Individually and On Behalf of All
Others Similarly Situated,                          07 Civ. 10528

                    Plaintiff,                      OPINION

        -against-

ACA CAPITAL HOLDINGS, INC. and
ALAN S. ROSEMAN,

                    Defendants.

------------------------------------X

A P P E A R A N C E S:


        Attorneys for Plaintiff

        COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
        58 South Service Road, Suite 200
        Melville, NY  11747
        By:  Samuel H. Rudman, Esq.

        ABRAHAM FRUCHTER & TWERSKY LLP
        One Pennsylvania Plaza, Suite 1910
        New York, NY  10119
        By:  Jack G. Fruchter, Esq.


        Attorneys for Defendants

        FRIED, FRANK, HARRIS, SHRIVER & JACOBSON
        One New York Plaza
        New York, NY  10004
        By:  Douglas H. Flaum, Esq.
             Stephanie J. Goldstein, Esq.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/14/10

**Sweet, D.J.**

Defendants ACA Capital Holdings, Inc. ("ACA" or the "Company") and Alan S. Roseman ("Roseman") (collectively, "Defendants") have moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the Corrected Consolidated Amended Class Action Complaint (the "Complaint") of plaintiff Blackmoss Investments Inc. ("Blackmoss" or the "Plaintiff").

Based upon the conclusions set forth below, the motion is granted.

## I.    PRIOR PROCEEDINGS

Blackmoss filed its original complaint on November 21, 2007 alleging a securities class action.  Lead plaintiff Guido Bergamini ("Lead Plaintiff") was designated on August 6, 2008.  The Complaint was filed on November 14, 2008.

The instant motion was heard and marked fully submitted on June 3, 2009.

1

## II.  THE FACTS

The facts set forth herein are based on (i) the
allegations in the Complaint which are assumed to be true
solely for purposes of this motion insofar as they do not
conflict with the language of the Prospectus (the
"Prospectus") filed in connection with ACA Capital's
November 10, 2006 initial public offering (the "IPO"); (ii)
the materials incorporated by reference in the Complaint;
(iii) ACA Capital's filings with the Securities and
Exchange Commission ("SEC"); and (iv) ACA's stock price
history.  Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000)
(in securities actions the court may review and consider
"public disclosure documents required by law to be, and
that have been, filed with the SEC"); Ganino v. Citizens
Utils., Co., 228 F.3d 154, 166 n.8 (2d Cir. 2000) (court
may take judicial notice of well-publicized stock prices).

ACA Capital is a holding company, incorporated in
Delaware, that "has all but ceased operations," Compl. ¶ 2,
as result of a restructuring that was consummated on August
8, 2008.  Id. ¶ 66.  On November 10, 2006, ACA became a
public company through its IPO, during which it issued
6,875,000 shares of common stock at $13 per share.  At that

2

time, it was actively involved in the financial services
sector, and Roseman served as ACA's President and Chief
Executive Officer.  Id. ¶¶ 11, 46-48.

Through its subsidiaries, ACA offered (1)
financial guaranty insurance products to participants in
the global credit derivatives markets, structured finance
capital markets, and municipal finance capital markets, and
(2) asset management services.  See id. ¶ 2; Prospectus at
1.  The insurance business, conducted by ACA Capital's
subsidiary, ACA Financial Guaranty ("ACA Financial"),
consisted of two product lines: (1) the structuring and
sale of credit default swaps in the institutional fixed
income market, and (2) the provision of insurance on
municipal and other public finance bonds to low investment
grade, non-investment grade, and unrated sectors of the
market.  Compl. ¶¶ 2, 18; Prospectus at 1-2.  At the time
of the IPO, approximately two-thirds of ACA's earnings were
derived from the insurance business.  Prospectus at 48-50.

ACA, in its asset management business, structured
and managed collateralized debt obligation ("CDO")
transactions.  A CDO is a securitization of fixed income
assets, and various debt and equity tranches are issued

3

against those assets.  Compl. ¶¶ 27-29.  The tranches are
rated based on prioritization of repayment, with the equity
tranche experiencing the first risk of loss.  Id. ¶ 28.
ACA earned fees from the structuring and management of
these CDOs.  Prospectus at 123-24.  In order to align its
interests with those investing in the CDOs, the Company
took a portion of the equity in its CDO deals, which would
expose it to the first losses experienced by the CDO.
However, since 2005, the Company held, at most, a minority
equity investment in any CDO it managed, and the CDOs were
not consolidated in ACA's financial statements.  Id. at 78-
79.  As of June 20, 2006, ACA had $12.1 billion in CDO
transactions under management, making it one of the largest
global CDO managers.  Id. at 123.

        The Prospectus stated that, throughout its
businesses, ACA "generally assume[d] credit risk to the
scheduled maturity of the underlying credit, including
credit risks that are of low investment grade quality or
non-investment grade."  Id. at 112.  A chart in the
Prospectus separately identifies each CDO and, in addition
to providing other information, classifies the collateral
for each CDO as either "Investment Grade," "High Grade,"
or, in the case of one of the CDOs, "Non-Investment Grade."

                            4

Id. at 79.  "[I]nvestment Grade" CDOs are defined in the
chart to refer to those whose collateral is rated "BBB- or
better."  Id.  However, the Prospectus also stated that
"certain of [its] investment grade CDOs include the ability
to invest a minority portion (20% or less) in non-
investment grade assets."  Id.  Thirteen of the seventeen
CDOs under ACA's management fell in this "Investment Grade"
category.  Id.  For the first nine months of 2006, 38% of
ACA's revenues and 62% of its pre-tax income was generated
through its CDO equity investments, and ACA's CDO asset
management business represented its fastest growing
business.  Compl. ¶ 19.

On or about November 2, 2006, ACA filed a Form S-
1/A Registration Statement (the "Registration Statement")
with the SEC in preparation for its IPO.  Id. ¶ 46.  On or
about November 9, 2006, ACA priced its initial offering of
6,875,000 shares of newly issued common stock and 23,541
shares of existing common stock at $13 per share.  ACA's
common stock commenced trading on the New York Stock
Exchange ("NYSE") on November 10, 2006.  In connection with
the IPO, the ACA's senior convertible preferred stock,
convertible preferred stock, and Series B senior
convertible preferred stock all converted to common stock

5

concurrently at their respective conversion ratios of
6,000:1 shares, 6,000:1 shares, and 6:1 shares. Id. ¶ 47.
Shortly thereafter, the Prospectus for the IPO, which
formed part of the Registration Statement, became effective
and, including the exercise of the over-allotment, more
than 6.8 million shares of ACA Capital's common stock were
sold to the public, raising more than $89 million. Id. ¶
48.

Plaintiff has alleged that at the time of the
IPO, ACA had materially increased its exposure to risky
CDOs with substantial exposure to subprime residential
mortgage-backed securities ("RMBS") and had purchased
substantial quantities of below-investment grade bonds that
were included in several of ACA's CDO deals. These below-
investment grade bonds are alleged to have increased the
risk of loss to ACA. In addition, ACA completed several
CDO deals in the fourth quarter of 2006 and insured
numerous other CDOs which are also alleged to have
increased ACA's exposure to subprime RMBSs. Id. ¶ 50.
According to a former credit team associate in ACA's CDO
asset management group who was responsible for purchasing
mortgage bonds to be packaged into CDOs, the following ACA
CDO deals from 2005 and 2006 contained bonds with a non-

6

investment grade rating:  ACA ABS 2005-1, ACA 2005-2, and
ACA ABS 2006-1.  This former employee was responsible for
purchasing many of the bonds included in these specific
CDOs.  Id. ¶ 51.  Plaintiff also alleges that ACA had
several CDOs in the planning stages for early 2007.

According to Plaintiff, ACA's increased exposure
to subprime RMBSs was far greater than that represented in
the Registration Statement.  Id. ¶ 52.  Plaintiff has
alleged that the Registration Statement was negligently
prepared and, as a result, contained untrue statements of
material facts, omitted other facts necessary to make the
statements made not misleading, and was not prepared in
accordance with the rules and regulations governing its
preparation.  Id. ¶ 49.

The Registration Statement's description of ACA's
business states, in pertinent part:

> ACA Capital is a holding company engaged in the
> business of providing financial guaranty
> insurance products to participants in the global
> credit derivatives markets, structured finance
> capital markets and municipal finance capital
> markets.  We also provide asset management
> services to specific segments of the structured
> finance capital markets.  We participate in our
> target markets both as a provider of credit

protection through the sale of financial guaranty
insurance products, for risk-based revenues, and
as an asset manager, for fee-based revenues.  We
conduct our financial guaranty insurance
businesses through ACA Financial Guaranty
Corporation, our "A" rated, regulated insurance
subsidiary.  We conduct our asset management
business through ACA Management, L.L.C., a
subsidiary of ACA Financial Guaranty. As of June
30, 2006, we had insured credit exposure of $31.4
billion and our assets under management for third
parties were $12.1 billion.  For the six months
ended June 30, 2006, we had total revenues of
$215.3 million and net income of $26.2 million.
As of June 30, 2006, our stockholders' equity was
$412.7 million.

Id. ¶ 53.  The Registration Statement also described ACA's
CDO asset management business, stating, in pertinent part:

We serve as an asset manager of collateralized
debt obligations, or CDOs.  A CDO is a
securitization of fixed income assets such as
bonds, loans, asset-backed securities, or ABS,
and credit default swaps, or credit swaps.  To
grow our assets under management, we sponsor CDOs
that acquire pools of fixed-income assets that we
select and manage.  CDO assets are funded by the
issuance of various liabilities with credit
profiles ranging from "AAA" rated debt to non-
rated equity.  Our CDOs have a diverse worldwide
institutional investor base that includes banks,
money managers, non-bank financial institutions,
hedge funds, pension funds and insurance
companies.

Our CDO Asset Management revenues consist of
asset management fees and risk-based revenue in
the form of return on our equity investments in
our CDOs.  Typically, we invest in some portion
of the equity of our managed CDOs, currently
between 5% to 25% of the total equity offered.

> These investments increase the marketability of
> our CDOs by aligning our interests as asset
> manager with those of our CDO investors and
> thereby maximizing our CDO assets under
> management.  In 2005 and the first six months of
> 2006, we invested a total of $16.0 million and
> $2.9 million, respectively, in the equity of our
> CDOs while increasing our assets under management
> by $2.1 billion and $2.2 billion, respectively.
> We completed our first CDO in January 2002 and,
> as of June 30, 2006, we had closed 17 CDO
> transactions and have grown our CDO assets under
> management from $2.4 billion as of year-end 2002
> to $12.1 billion as of June 30, 2006.  At June
> 30, 2006, our weighted average asset management
> fee was 0.21% per annum on CDO assets under our
> management.  Based on our knowledge of the
> market, we believe we are one of the largest
> global CDO managers as ranked by assets under
> management.

Id. ¶ 54.


According to Plaintiff, these statements represented inaccurate statements of material fact because they failed to disclose that ACA had materially increased its exposure to risky CDOs and subprime RMBSs that resulted in a greatly increased risk of loss to ACA.  Id. ¶ 55.


In addition, Plaintiff alleges that under applicable SEC rules and regulations governing the preparation of the Registration Statement and Prospectus, the Registration Statement was required to disclose that

the rising trend of delinquencies and foreclosures in
subprime RMBSs was likely to cause the Company to incur
increased losses on its CDO positions and CDSs.  Id. ¶ 57.
Specifically, Plaintiff alleges that ACA was required,
pursuant to Item 11 of Form S-1, to provide in the
Registration Statement the information required by Item 303
of Regulation S-K, 17 C.F.R. § 229.303, and the SEC's
related interpretive releases thereto, including any known
trends, events or uncertainties that had caused or were
reasonably likely to cause the ACA's financial information
not to be indicative of future operating results.
Plaintiff asserts that the rising trend of delinquencies
and foreclosures in subprime RMBSs were reasonably likely
to have a material impact on ACA's continuing operations
and were therefore improperly omitted from the Registration
Statement.  Id. ¶ 58.

        The Prospectus disclosed that, as of June 30,
2006, $7.45 billion of the $12.12 billion in assets in its
CDOs, approximately 61%, were comprised of RMBS.
Prospectus at 13; see also id. at 123 ("We currently
sponsor and manage CDOs backed by investment grade
corporate financial obligations, ABS and RMBS, and non-
investment grade leveraged loans and bonds.").

The Prospectus, in a section entitled "We face risks from the concentration of our liabilities and investments," also stated:

A large portion of the financial assets included in our CDOs are residential MBS, or RMBS, which present concentration risk to the national housing market. . . .  Should the country experience an economic decline, mortgage borrowers comprising the security underlying such RMBS may default on their loans which may in turn result in a default on the RMBS and losses to any of our CDOs which purchased such RMBS exposure. Also, some of the mortgages underlying our CDO exposures include interest only payments which are due to reset in the coming years.  The reset of these mortgages to include interest plus principal payments may also cause an increase in obligor defaults of these mortgages.  In addition, a significant portion of the assets securing the RMBS that we buy are secured by mortgages on properties in California and to a lesser extent in New York and Florida.  Should one of those states specifically experience an economic downturn or natural disaster resulting in significant defaults on mortgages issued in that state, certain RMBS purchased into our CDOs may also experience defaults or lower market values.  The occurrence of defaults in RMBS, could materially negatively impact the performance of our CDOs generally, making it difficult for us to continue to sponsor CDOs, and cause us to experience returns below our expectations on, or lose a position or all of, our equity investment in our CDOs.  The flattening in appreciation of home values, or depreciation of home prices, either nationally or regionally particularly in areas where we have concentrated exposure, may increase the severity of the economic impact of this risk.

11

Id. at 13; see also id. at 12 ("Increasing default rates may also negatively impact our equity returns and the overall performance of our CDOs.").

In the "Business Strategy" section of its Prospectus, ACA stated:

> We have significantly increased our insured credit exposure and assets under management, and intend to continue to grow our financial guaranty insurance Structured Credit and Municipal Finance businesses and CDO Asset Management business, in terms of number of transactions, size of transactions, as well as the types of asset classes we insure and manage.

Id. at 4.  The Prospectus also disclosed that as of June 30, 2006, ACA's CDO assets under management had increased $2.2 billion to $12.1 billion since the beginning of 2006, and had increased $9.7 billion since December 31, 2002. Id. at 123.

In its Form 8-K dated Feb. 14, 2007, ACA disclosed that it closed two CDOs in the fourth quarter of 2006 - a $750 million asset-backed CDO and a $300 million leveraged loan backed CLO.  ACA Capital Holdings, Inc.,

Report of Unscheduled Material Events Or Corporate Changes
(Form 8-K) 3 (Feb. 14, 2007).  In its Form 10-K for year
end 2006, ACA disclosed that "current market trends
indicate higher delinquency and foreclosure rates in the
2006 vintage of sub-prime residential mortgages," which
were held in 6 of 22 CDOs, and which, depending on the
actual defaults, could reduce ACA's returns on its equity
in those CDOs.  ACA Capital Holdings, Inc., Annual Report
Pursuant to Section 13 or 15(d) of the Securities Exchange
Act of 1934 (Form 10-K) 31 (Mar. 30, 2007).  In its Form 8-
K dated May 9, 2007, ACA disclosed that it had closed a
$1.5 billion cash and synthetic mezzanine backed CDO in the
first quarter of 2007.  ACA Capital Holdings, Inc., Report
of Unscheduled Material Events Or Corporate Changes (Form
8-K) 3 (May 9, 2007).  ACA's stock continued to trade above
the offering price of $13 per share through June 22, 2007.


        On July 12, 2007, ACA Capital posted its
"Structured Credit Business—RMBS Exposure Detail" on its
website.  The posting indicated that ACA Capital had
greatly increased its exposure to subprime RMBSs by
completing several CDO deals in late 2006 and early 2007
and that ACA would take losses even before all of the low-
rated subprime mortgage bonds from 2006 and 2007 defaulted.

In response to this posting, the price of ACA Capital stock started to decline precipitously, falling from $10.45 per share on July 9, 2007, to $5.17 per share on July 24, 2007. Compl. ¶ 63.

On November 7, 2007, ACA issued a press release announcing its financial results for the third quarter of 2007, the period ended September 30, 2007.  The Company reported a quarterly net loss of $1 billion, or $29.42 per share, which it attributed to "mark-to-market" losses on the Company's portfolio of structured credit transactions. Id. ¶ 64.  Of the approximately $1 billion loss, the CDO business contributed a loss of $32.7 million.  Press Release, ACA Capital Holdings, Inc., ACA Capital Reports Financial and Economic Results from the Third Quarter and Nine Months Ended Sept. 30, 2007 (Nov. 7, 2007) at 4.

Shortly after the announcement, ratings agencies indicated that they were reviewing ACA's credit rating for a downgrade.  Compl. ¶ 65.  This credit rating was critical to the functioning of the Company's insurance business, Prospectus at 10-11, and the review resulted in a series of forbearance agreements between ACA and its swap counterparties.  Id.

14

On August 8, 2008, ACA issued a press release announcing that ACA Financial had entered into a global settlement agreement with its structured credit and other similarly situated counterparties.  According to the press release, the agreement provided for a comprehensive plan to satisfy and discharge all claims associated with ACA Financial's exposure to CDSs, including the swaps on all exposure to asset-backed securities and corporate CDOs. Under the agreement, the counterparties received a cash payment and surplus notes issued by ACA Financial. According to the press release, holders of the surplus notes would share pro-rata any future dividends or distributions from ACA Financial up to $1 billion in the aggregate.  95% of the surplus notes were issued to the counterparties, with the remaining 5% being issued to ACA. ACA also agreed that it would no longer be responsible for the management of ACA Financial.  The press release further indicated that ACA Financial would operate as run-off financial guaranty insurance company that would not issue any new insurance policies or guarantees but would exist to adjust, defend and pay claims on its in-force book of financial guaranty insurance policies, virtually all of

which related to exposure on municipal debt obligations.
Id. ¶ 66.

At the time of the filing of the Complaint, ACA
stock traded for $0.05 per share, well below the IPO price
of $13 per share.

## III. DISCUSSION

### A.    Legal Standards

Plaintiff's claims under the Securities Act of
1933 are measured by Rule 8's notice pleading requirements,
rather than Rule 9(b)'s particularity ones.  Under Rule 8,
a plaintiff must plead specific "[f]actual allegations"
beyond mere "labels and conclusions, and a formulaic
recitation of the elements of a cause of action . . . ."
Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).
Thus, a complaint must contain allegations demonstrating a
basis for relief beyond a speculative level.  Id.

For liability to attach under either Section 11
or 12(a)(2) of the Securities Act of 1933, a defendant
must, among other things, make "an untrue statement of a

material fact or a material omission" within a registration statement or prospectus. Donovan v. Am. Skandia Life Assur. Corp., 96 Fed. Appx. 779, 780 (2d Cir. 2004). Thus, a plaintiff must identify the statement that it deems to be false or misleading. See, e.g., Lasker v. N.Y. State Elec. & Gas Corp., 85 F.3d 55, 57-58 (2d Cir. 1996) (both sections 11 and 12 "require[] that [a plaintiff] identify a materially misleading statement made by the defendants"); In re WorldCom, Inc. Sec. Litig., 303 F. Supp. 2d 385, 390 (S.D.N.Y. 2004) ("Although the pleading requirements for a Section 11 claim are minimal, Section 11 does require that a plaintiff identify an 'untrue statement of a material fact' or allege that the registration statement 'omitted to state a material fact.'" (quoting 15 U.S.C. § 77k(a)). Those statements are not read in isolation. Rather,

> [i]n evaluating a prospectus, we read it as a whole. Our inquiry does not focus on whether particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the securities.

Demaria v. Andersen, 318 F.3d 170, 180 (2d Cir. 2003) (internal citations and quotation marks omitted); In re Worldcom, 303 F. Supp. 2d at 389.

"The securities laws do not require clairvoyance in the preparation of offering documents," Lin v. Interactive Brokers Group, Inc., 574 F. Supp. 2d 408, 421 (S.D.N.Y. 2008), and a misstatement or omission can only be actionable where it was "material as of the date the offering documents became effective." Id. at 415; In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005) ("[A] plaintiff must allege facts demonstrating the defendant possessed the omitted information at the time the registration statement became effective and that the defendant had a duty to disclose that information."), aff'd sub nom. ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., No. 07-1786, 2009 U.S. App. LEXIS 972 (2d Cir. Jan. 21, 2009).

The adequacy of the allegations in a complaint must be determined in accordance with Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009). While a complaint "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. at 1949 (citing Twombly, 550 U.S. at 555) (internal quotation marks omitted). To proceed to

18

discovery, a plaintiff must demonstrate that his claim is facially plausible, which requires

> plead[ing] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of entitlement to relief."

Id. (quoting Twombly, 550 U.S. at 556, 557).


### B.    Plaintiff Has Not Identified a Materially False or Misleading Statement or Omission


The Complaint alleges that the Prospectus failed to disclose to potential investors that ACA had substantially increased its exposure to risky CDOs by purchasing below-investment grade bonds in some of its CDO deals in 2005 and 2006.  However, the Prospectus disclosed that ACA's investments included investments in these low-grade bonds.  See, e.g., Prospectus at 112 (ACA's investments include "credit risks that are of low investment grade quality or non-investment grade"); id. at

79 (CDOs have ability to invest up to 20% "in non-investment grade assets").

The Complaint also alleges that the Prospectus left an investor unaware that ACA's CDOs contained RMBSs. However, under a section devoted specifically to the disclosure of risks faced by ACA's investments, the Prospectus stated that "a large portion" of the assets in ACA's CDOs, $7.4 billion, were RMBSs, and that increased defaults or foreclosures (whether from an economic decline or depreciation in home prices) could "materially negatively impact the performance of" those CDOs.  Id. at 13.

Plaintiff has further alleged that investors were not informed that ACA would continue to increase its CDO assets under management.  However, the Prospectus disclosed that ACA had "significantly increased" this business and, as part of its future "business strategy", it "intend[ed] to continue to grow" its CDO portfolio "in terms of number of transactions, size of transactions, as well as the types of asset classes we insure and manage."  Id. at 4.

Finally, Plaintiff has alleged that ACA failed to disclose that it had insured CDOs with increased exposure to sub-prime RMBSs.  However, the Prospectus again disclosed (1) that RMBSs are among the financial assets underlying its structured credit transactions, id. at 1, and (2) the attendant risks of such exposure even though what was insured at the time was Triple-A rated.  Id. at 13.

The Prospectus's disclosure of information alleged in the Complaint to have been withheld from prospective investors renders the Complaint insufficient as a matter of law.[1]  See, e.g., Rombach v. Chang, 355 F.3d 164, 175-76 (2d Cir. 2004) (dismissing Securities Act claims where offering documents did not contain alleged omissions and included sufficient cautionary information concerning financial risks); Olkey v. Hyperion 1999 Term Trust, 98 F.3d 2, 5 (2d Cir. 1996) (dismissing Securities Act claims because "[t]he prospectuses warn investors of exactly the risks the plaintiffs claim was not disclosed"); Zirkin v. Quanta Capital Holdings Ltd., 07 Civ. 851 (RPP),

---

[1] In opposing Defendants' motion to dismiss, Plaintiff argues that the allegations set forth in the Complaint establish the existence of a fact issue that renders dismissal at this stage of the litigation inappropriate.  However, as the Supreme Court has stated, "[e]valuating the sufficiency of a complaint is not a 'fact-based' question of law." Iqbal, 129 S. Ct. at 1947.

2009 U.S. Dist. LEXIS 4667, at *39 (S.D.N.Y. Jan. 23, 2009)
(dismissing Securities Act claims because no reasonable
investor could have been misled "after reading the
Prospectus and Registration Statement as a whole").

### C.    The Complaint Has Failed to Allege a Violation of Item 303

The Complaint further alleges that the
Registration Statement failed to comply with Item 303 of
Regulation S-K which requires the issuer of stock to
"[d]escribe any known trends or uncertainties that have had
or that the registrant reasonably expects will have a
material favorable or unfavorable impact on net sales or
revenues or income from continuing operation."  17 C.F.R.
229.303(a)(3)(ii).

Knowledge of the existence of a "rising trend" of
subprime foreclosures and delinquencies at the time of the
November 2006 IPO is an essential allegation for purposes
of a claim based on Item 303.  See J&R Mktg. v. Gen. Motors
Corp., 549 F.3d 384, 391 (6th Cir. 2008) (dismissing
complaint where allegations demonstrated information was
knowable, not known, to defendants because "duty of

disclosure arising from Item 303 does require knowledge");
Garber v. Legg Mason, Inc., 537 F. Supp. 2d 597, 614
(S.D.N.Y. 2008) (holding that Item 303 requires trend to be
known and rejecting argument "that pleading a trend's
existence is enough to support a claim"); Panther Partners
Inc. v. Ikanos Commc'ns, Inc., 538 F. Supp. 2d 662, 673
(S.D.N.Y. 2008) (dismissing claim of noncompliance with
Item 303 where "requisite knowledge during the time period
in question is clearly absent" (internal quotation marks
omitted)).

         Here, the Complaint does not allege that
Defendants were actually aware of any purported "trend of
delinquencies and foreclosures" at the time of the IPO.
Plaintiff, however, has contended that what Defendants did
or did not know at the time of the IPO is irrelevant to a
Securities Act claim based on the Item 303 disclosure
requirements.  Plaintiff's legal authorities in support of
this proposition, however, deal solely with general
pleading rules for Section 11 and 12(a)(2) claims, not with
the requisite factual allegations to proceed under an
omissions theory based on Item 303.  See Greenapple v.
Detroit Edison Co., 618 F.2d 198, 203 (2d Cir. 1980) (no
allegation of Item 303 violation); In re CIT Group, Inc.

Sec. Litig., 349 F. Supp. 2d 685, 688 (S.D.N.Y. 2004)
(same).  While it is true that Section 11 claims generally
do not require pleading scienter, Item 303's requirement of
knowledge requires that a plaintiff plead, with some
specificity, facts establishing that the defendant had
actual knowledge of the purported trend.  See Stickman v.
Hart Brewing, Inc., 143 F.3d 1293, 1297 (9th Cir. 1998)
(Item 303 "mandates . . . knowledge of an adverse trend");
Panther Partners, 538 F. Supp. 2d at 673; In re Turkcell
Iletsim Hizmetler, A.S. Sec. Litig., 202 F. Supp. 2d 8, 13
(S.D.N.Y. 2001); Milman v. Box Hill Sys. Corp., 72 F. Supp.
2d 220, 230-31 (S.D.N.Y. 1999) (disclosure obligation would
arise under Item 303 only "[i]f, as Plaintiffs allege,
Defendants had specific knowledge" of purported trend, and
denying motion to dismiss because "Plaintiffs specifically
charge[d] that at the time of the Offering Defendant had
actual, not hypothetical, knowledge" of purported trend);
In re Authentidate Holding Corp. Sec. Litig., 05 Civ. 5323
(LTS), 2009 U.S. Dist. LEXIS 23462, at *6-7 (S.D.N.Y. Mar.
23, 2009) ("Item 303 . . . requires, in relevant part, that
a registrant describe any known trends . . . ." (internal
quotation marks and citation omitted)).

Plaintiff has sought to dismiss these cases, to the extent they require scienter-like allegations, as wrongly decided on the grounds that Securities Act claims are negligence based and therefore cannot possess a knowledge requirement. However, omissions are only actionable under Sections 11 and 12(a)(2) where "defendants had a legal obligation to disclose the allegedly omitted information." Garber v. Legg Mason, Inc., 537 F. Supp. 2d 597, 610 (S.D.N.Y. 2008). Here, Item 303 specifies when information became subject to disclosure, i.e., when it becomes a "known trend." 17 C.F.R. § 229.303(a)(3)(ii)); Certain Investment Company Disclosures, Exchange Act Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989) ("A disclosure duty exists where a trend . . . is . . . presently known to management . . . ."). Accordingly, in order to state a claim arising from a violation of Item 303, sufficient factual allegations must be proffered to establish the requisite legal obligation.

Moreover, the various sources cited by Plaintiffs as evidence of the existence of a "rising trend of delinquencies and foreclosure in sub-prime RMBSs," Compl. ¶ 58, do not establish that Defendants would have had knowledge that such a trend existed. The OFHEO price

25

index, which purportedly reflected declining home prices in
the latter part of 2006, Compl. ¶ 32, was first published
on March 1, 2007, four months after the IPO.  Similarly,
the ABX Indices, Compl. ¶¶ 42-43, do not indicate a
downward trend in value until after the IPO.  Four of the
news articles cited by Plaintiff as disclosing information
on foreclosures, defaults and prices in August 2006, Compl.
¶¶ 38-41, were published after the IPO and cannot be used
to establish knowledge of a trend prior to the IPO.
Finally, the HSBC report on mortgage defaults, Compl. ¶ 34,
has not been alleged to be publicly available prior to the
IPO.

Plaintiff's allegation of the existence of a
"rising trend" is therefore based on three articles
published before ACA's IPO, Compl. ¶¶ 35-37, one of which
does not discuss foreclosures or delinquencies.  See id. ¶
35.  The data cited in the other two articles establishes,
at best, increased foreclosure rates over the prior two
months.  See Compl. ¶¶ 36, 37.  As a matter of law, a two-
month period of time does not establish a "trend" for
purposes of the disclosures required by Item 303.  See,
e.g., Turkcell, 202 F. Supp. 2d at 13 (single quarter
decline in operating income need not be disclosed pursuant

to Item 303); Kapps v. Torch Offshore, Inc., 379 F.3d 207,
218 (5th Cir. 2004) (a five-month "decline in natural gas
prices [did] not yet constitute[] a trend" requiring
disclosure); Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d
1182, 1191 (11th Cir. 2002) ("It may be that a particular
pattern is . . . of such short duration that it will not
support any conclusions about the registrant's business
environment.").

        Because Plaintiff has failed to allege sufficient
facts to establish Defendants' knowledge of a trend of
rising foreclosure rates at the time the Registration
Statement was filed, its claims based on violation of Item
303 are dismissed.

### D.    Negative Causation Bars the Complaint

        Sections 11 and 12(a)(2) claims are subject to an
affirmative defense of "negative causation," which
precludes recovery for price declines that are not the
result of an alleged misrepresentation.  See 15 U.S.C. §§
77k(e), 77l(e); McMahan & Co. v. Wherehouse Entm't, 65 F.3d
1044, 1049 (2d Cir. 1995) ("[A] 'price decline before
disclosure may not be charged to defendants.'" (quoting

Akerman v. Oryx Commc'ns, Inc., 810 F.2d 336, 342 (2d Cir.
1987)); Azzolini v. Corts Trust II for Provident Fin. Trust
I, No. 03-CV-1003, 2005 U.S. Dist. LEXIS 38454, at *19
(E.D. Tenn. Dec. 14, 2005) ("This loss causation
affirmative defense allows a defendant to avoid liability
if the depreciation in the value of the security did not
result from any nondisclosure or false statement made in
the prospectus or registration statement."). While a
plaintiff pursuing a Securities Act claim is not required
to affirmatively plead causation, a negative causation
defense may be considered on a dismissal motion where the
absence of loss causation is apparent on the face of the
complaint. See, e.g., In re WRT Energy Secs. Litig., No.
96 Civ. 3610 (JFK), 2005 U.S. Dist. LEXIS 1894, at *36
(S.D.N.Y. Feb. 9, 2005); Azzolini, 2005 U.S. Dist. LEXIS
38454, at *19.

Plaintiff has opposed Defendants' negative
causation defense by asserting that cases permitting such a
defense are wrongly decided. However, nothing bars a court
from dismissing claims based on an affirmative defense,
see, e.g., Official Comm. of Unsecured Creditors of Color
Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 158 (2d
Cir. 2003), and negative causation is simply an application

28

of this principle.  See, e.g., In re Alamosa Holdings, Inc., Secs. Litig., 382 F. Supp. 2d 832, 865 (N.D. Tex. 2005) (granting 12(b)(6) dismissal based upon negative causation); Azzolini, 2005 U.S. Dist. LEXIS 38454, at *19 (same).

     The Complaint and ACA's public filings upon which it is based establish that the decline in ACA's stock was not caused by the allegedly false and misleading statements in the Prospectus.  ACA's stock traded on the New York Stock Exchange above the November 10, 2006 IPO price of $13 per share through June 22, 2007.  During that period, ACA disclosed updated information concerning its CDO portfolio, including the number of additional CDO deals that had been closed and the nature of the assets contained within them. Under these circumstances, Plaintiff cannot establish a causal relationship between Defendants' alleged misrepresentations and subsequent declines in ACA's stock price.  See Joffee v. Lehman Bros., Inc., 410 F. Supp. 2d 187, 194 (S.D.N.Y. 2006).

## IV.  CONCLUSION

Upon the facts and conclusions set forth above, Defendants' motion is granted and the Complaint is dismissed with prejudice.

It is so ordered.

New York, NY
January / 7, 2010

ROBERT W. SWEET
U.S.D.J.